### IN THE UNITED STATES DISTRICT COURT
### FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| **JEFFERY MORRISON,** | ) | |
| | ) | |
| **Petitioner,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 06-CV-0183-MJR** |
| | ) | |
| **DONALD GAETZ,**[1] | ) | |
| | ) | |
| **Respondent.** | ) | |

### MEMORANDUM AND ORDER

**REAGAN, District Judge:**

#### A.     Introduction and Procedural Background

A Massac County jury convicted petitioner Jeffery Morrison on November 17, 1999 of the first-degree murder of Roxanne Colley, two counts of aggravated kidnaping of Colley's twin sons, one count of armed violence and one count of unlawful possession of a stolen motor vehicle.[2] (Resp., Ex. A.) The court sentenced Morrison to forty years imprisonment for first degree murder, ten years for each kidnapping count, and twelve years for armed violence. Six-and-a-half years later, Morrison petitioned the Court for a writ of habeas corpus pursuant to 28 U.S.C. § 2254, seeking a new trial. United States District Judge William Stiehl promptly referred the case to Magistrate Judge Clifford J. Proud (Doc. 4), who reported and recommended on February 26, 2009 that the Court deny Morrison's petition (Doc. 43).

---

[1]Originally Morrison filed his petition against Alan Uchtman, who is no longer the Warden of Menard Correctional Center. Gaetz is the current warden and is substituted as the respondent. ***See* Rules Governing Section 2254 Cases R. 11 (applying the Federal Rules of Civil Procedure to habeas proceedings where there is no conflict with habeas rules); Fed. R. Civ. P. 25(d) (providing for the automatic substitution of successors to official parties).**

[2] The trial court vacated Morrison's conviction for possession of a stolen motor vehicle

Donald Gaetz, the warden of the facility incarcerating Morrison, timely objected to Judge Frazier's report and recommendation. (Doc. 43.) Morrison filed his objections late (Doc. 47) along with a motion for an extension of time (Doc. 46). The Court granted him leave to file late, and in accordance with the order he filed amended objections. (Doc. 54.) Because timely objections were filed, the Court must review de novo those portions of the Report to which specific objections have been made. **28 U.S.C. § 636(b)(1)(B) (2006); Fed. R. Civ. P. 72(b); S.D. Ill. R. 73.1(b);** *Govas v. Chalmers***, 965 F.2d 298, 301 (7th Cir. 1992).** The Court may accept, reject, or modify the recommended decisions, or recommit the matter to the Magistrate Judge with instructions. **Fed. R. Civ. P. 72(b); S.D. Ill. R. 73.1(b);** *Willis v. Caterpillar, Inc.***, 199 F.3d 902, 904 (7th Cir. 1999).** Finding the objections of Morrison without merit and that of Gaetz moot, the Court will overrule both Gaetz's objection and Morrison's objections and adopt Judge Proud's report and recommendation.

### B.      History

1. Evidence Before the Illinois Courts

The relevant evidence from the record before the Illinois courts is as follows. On October 23, 1998, Roxanne Colley died at her home in Brookport, Illinois, from a gunshot wound to her back. Roxanne was the girlfriend of Morrison's brother, Glen Morrison. At the time of the murder, Glen had been staying at Colley's home with Roxanne and her twin sons for about a month.

R.D. Riley, one of Colley's friends, testified that he lived near Hickory,

---

after determining it was a lesser included offense of armed violence.

Kentucky. He said that he had helped Colley care for her twin sons for approximately two years after their birth. Riley testified that on October 22, 2009, the day before the murder, Morrison, Glen, Colley, and her twin sons Alex and Eugene arrived at his home in Colley's vehicle to pick up a heating stove Riley had given to Colley. According to Riley, it was the first time Glen had been inside his home, though Morrison had spent the night there two or three times (Trial Tr. C289, C293). Because the stove would not fit in the car, Colley drove Riley's pickup truck with the stove in the bed. Riley said he rode with Colley, while the others followed in Colley's car. Riley and Glen spent the night at Colley's house, but Morrison did not. Riley said that early the next morning they picked up Morrison, then drove Riley home. After arriving home, Riley fed his dogs and hogs. He said that as he came around the corner of his house, he saw Morrison jumping into Colley's car very quickly with something wrapped up in a red shirt or towel, which he placed in the back seat or on the floorboard.

Riley kept a deer rifle in his bedroom closet behind some clothes. He testified that he noticed the rifle was missing a few days later. Riley did not give anyone permission to take his gun. Riley would later identify the murder weapon as his gun.

Glen testified that Colley was his girlfriend and that he had been staying at her home for approximately one month. Glen admitted that he drank a vast amount of beer and a fifth of whiskey the day before the murder. Glen's account of the day before the murder generally mirrors Riley's account with the following exceptions: Glen testified that defendant did not accompany them on the first trip to Riley's home to pick up the stove. In Glen's version, the party consisted of Colley, Glen, Colley's mother, Colley's mother's boyfriend, and the boys (Trial Tr. C445). Glen also admitted that the night before the murder he passed out drunk at Colley's kitchen table, got into an argument with Colley, and beat her up after she slapped him.

He testified that Riley and the boys were not in the kitchen during the fight.

Glen testified that the morning of the murder he and Colley went to a store to purchase more beer, then picked up Morrison and returned to Colley's house. By this time, Glen had already consumed a "couple six packs." Glen said that he and defendant continued drinking beer and whiskey, but Colley and Riley did not drink anything. Glen testified that Colley then drove Riley home in his truck, while Morrison drove Colley's car with Glen and the boys. After dropping off Riley, Colley drove the rest of the group to Paducah. Glen went to a bar and then walked to Colley's mother's boyfriend's house.

Glen testified that Colley drove everyone back to her home that afternoon. Glen said he passed out from his drinking for a while after arriving at Colley's home. Glen recalled that he awoke and heard Colley accuse Morrison of stealing Riley's gun. He said he then heard Morrison threaten to shoot her, to which she replied he did not have the nerve to shoot her. Glen says Morrison was in the middle of the living room when he shot Colley, who was walking out the front door at the time. Colley was shot in the back. Glen said she fell outside. Glen testified that Morrison then wiped the gun off, pointed it at him, and told him he would blow his head off too. Glen said he and Morrison picked up Colley and placed her inside the house. Glen claims no more than two minutes passed between the beginning of the argument and the time they carried Colley's body inside.

Glen said both of the twins were in position to see Morrison with the gun, as one was in the hallway and the other was in the living room. Glen testified he suggested that they take the boys to Colley's mother's house. He said Morrison said they were taking the boys as hostages. Glen testified that when they went outside, one of the boys yelled that Morrison shot his mother and that she was dead.

-4-

Glen further testified that they left in Colley's car with the boys in the back seat. He said the gun, which he had never seen before, was between the front seats. Glen said he saw a sheriff's car near Paducah, Kentucky, and hit the steering wheel causing the car to swerve so that the sheriff's car would stop them. Glen testified that he told police at the scene of the traffic stop that Morrison had shot Roxanne.

During questioning in Paducah after the traffic stop, Glen told police that Morrison must have purchased the gun at a pawn shop in Paducah. Glen claims that because everything was "hazy" that night due to his drinking, he did not remember until later that Roxanne had accused Morrison of taking Riley's rifle.

Glen was initially charged with Colley's murder, but the state dismissed all charges against Glen regarding the murder and the kidnapping of Colley's children. Glen agreed to plead guilty to domestic battery for hitting Colley and to testify against Morrison.

Douglas McDonald testified that on October 23, 1998, he lived across the street from the victim. At about six o'clock p.m. that evening, Douglas heard a gunshot from the direction of Roxanne's home. Douglas testified that when he looked toward the source of the sound of the gunshot, he saw Morrison and his Brother Glen pick up Roxanne's body and carry her inside her home. Douglas testified that he got on his bicycle and rode to the front of Roxanne's house. Once there, he witnessed the Morrison brothers getting into Roxanne's vehicle. Douglas testified that one of the brothers got out of the vehicle, went back into the house, and returned with Colley's four-year-old twin sons. Douglas interpreted the behavior of the boys as indicating that they did not want to go with the Morrison brothers. Before the brothers drove away with the boys, Douglas said he heard one of the boys say "Jeff shot my mommy – shot her dead." Douglas testified that he went inside Colley's house and found her

dead.

Douglas admitted that although he had met Morrison and Glen, he did not know them well enough to tell them apart. Douglas stated that he takes medication three times a day for pain and a nervous condition, but claimed that he had not taken any medication the day Colley was murdered. Douglas admitted he had convictions for burglary.

Andrea McDonald, Douglas's niece, testified that she thought she heard a door slam around the time Colley was murdered. Andrea said she saw Colley "flying" out the door. Initially she approached Colley's yard to help her. A passerby told Andrea that what she heard was a gunshot. Andrea testified that she saw Morrison wiping his hands off with a white rag and pulling Colley back inside her home. Although Andrea admitted she should not tell Morrison and Glen apart, she agreed that she was "absolutely certain" that it was Morrison that came out of the front door of the house.

Eric Augustus was a McCracken County sheriff's department special deputy on October 23, 1998. He and Deputy Kevin Garland pulled over Colley's car after it swerved into their lane, crossed the center line, and "went off the corner of the street." Augustus testified that Morrison was driving the vehicle, Colley's boys were in the back seat, and Glen was sitting in the passenger seat. Augustus saw the rifle next to Glen on the passenger side of the vehicle.

Illinois State Police Sergeant Alan R. Burton testified that he interviewed Glen the evening of October 23, 1998. Burton agreed that Glen did not tell him about an argument between Morrison and Colley over Riley's gun immediately before the shooting. Glen told Burton that Morrison might have purchased the gun from a pawn shop in Paducah. Burton said that Glen told him that Morrison said he and Colley had been seeing each other while Glen was out of town working. Glen claimed he did not believe Morrison. Burton said Glen also

mentioned to Burton that various members of his family were angry with each other because Morrison's girlfriend, Rose Ulmer, had called the police on Glen. Burton testified that Glen appeared to have consumed a lot of alcohol the night Burton took his statement. Burton said Glen seemed very angry with Morrison over Colley's death and made several threatening remarks about what he would do to him.

Bruce Warren, a forensic scientist with the Illinois State Police, testified that he found no fingerprints on the rifle or a spent shell found in the car.

Dr. Mark LaVaughn performed an autopsy on Roxanne. He determined that she died from a single gunshot wound to the back, and estimated that she died one to two minutes after she was shot. He estimated the barrel of the gun was about three feet from her back. Roxanne had no drugs or alcohol in her system when she died.

2. Affidavit of Shawn Hollowell

In addition to the evidence before the Illinois courts, Morrison files with his amended petition the affidavit of Shawn Hollowell (Doc. 42, Ex. 1). The Hollowell affidavit bears a signature reading "Shawn Hollowell," but is not notarized although it is made "under penalty of perjury." Hollowell was apparently incarcerated with Morrison at the Menard Correctional Center. Hollowell has multiple felony convictions, including convictions for forgery. *(See* Doc. 56 at 9; Doc. 50 at 6.) The Hollowell affidavit claims that Hollowell spoke with Glen multiple times while they were incarcerated in the Massac County Jail. Glen said he had nothing to worry about since he had set it up to blame his brother. According to the affidavit, Glen revealed that his motive was to get even with Morrison and Colley, Glen's girlfriend, for sleeping together.

The Hollowell affidavit indicates that Glen said he stole the gun, and was

-7-

concerned that the police would discover the gun was not from a pawn shop as he had initially told the police. The affidavit indicates that Glen bragged about covering up his mistake by telling police that Morrison stole the gun and falsely claiming he wrote a letter as soon as he remembered. The affidavit also indicates that Glen expressed concern about beating up Colley the night before he shot her. Finally, the affidavit says that Hollowell suggested to Glen that it sounds like Glen was going to get away with murder, to which Glen responded "it's not the first time."

### C.      Analysis

The Court begins its analysis by noting that the role of federal habeas relief to state prisoners is not to give state prisoners an opportunity to retry their case or to reargue appeals in federal court. ***Bell v. Cone*, 535 U.S. 685, 693 (2002)**. With respect to any claim adjudicated on the merits by a state court, habeas relief is only available to cases wherein the state court determination "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States" or to decisions "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." **28 U.S.C. § 2254(d).**

With that in mind, the Court proceeds to the parties' objections.

1. Morrison's Objection to the Facts

Morrison objects to Magistrate Judge Proud's use of the facts as determined by the Illinois appellate court in pages 2–5 of the report (Pet'r's Objections ¶ 8). While Morrison admits that the state court's factual findings are presumed correct, he argues that the affidavit of Shawn Hollowell rebuts the presumption by clear and convincing evidence as required by

-8-

§ 2254(e)(1) and so Judge Proud should not have included the different facts in his report.

Morrison, however, misreads the Report and Recommendation. The part about which he complains simply recites the evidence presented at trial and the developments in Morrison's case. Judge Proud properly noted and considered the Hollowell affidavit when evaluating Morrison's claim of actual innocence, which the Court will evaluate later. His objection on this point is without merit.

He notes in the same objection and a later one (¶ 16) that both Judge Proud and the Fifth District characterized the evidence against him as "overwhelming" and objects that Judge Proud relied on this label. This objection assumes that Judge Proud did not undertake an independent evaluation of the facts and simply adopted the Fifth District's label. The Court disagrees with petitioner in that assumption. It is readily apparent that Judge Proud's findings are not simply an adoption of the State Court's facts without reference to those properly brought to him in this Court. To the extent that the petitioner is disagreeing with Judge Proud's evaluation of the facts, the Court will address that part of those objections when it examines the claim of actual innocence and ineffective assistance in later objections.

2. Morrison's Objections Regarding the Video Tape

During Morrison's trial, the prosecution played a video tape of Morrison being interrogated by law enforcement officers (Trial Tr. C471–83, C774–84). At the end of the tape Morrison invoked his Miranda rights after being advised he was a suspect in a murder. Defense counsel did not specifically object to the playing of the end of the tape, though counsel tried both during trial and in pretrial hearings to exclude the tape. Morrison argued that the admission of the end of the tape violated his Due Process rights and that his trial counsel was ineffective in relation to the admission of the video tape. Judge Proud disagreed to both.

Morrison objects to Judge Proud's finding that the prosecution made no evidentiary use of Morrison's silence (Pet'r's Objections ¶¶ 16–18). Use of a defendant's silence at the time of arrest and after receiving Miranda warnings for impeachment purposes violates the Due process Clause of the Fourteenth Amendment. ***Doyle v. Ohio*, 426 U.S. 610, 619 (1976); *see also United States v. Hale*, 42 U.S. 171 (1975).** Later cases made clear that it is the evidentiary use of a defendant's silence which is prohibited. The admission of evidence of an accused's silence, without more, does not violate the Due Process clause. ***See, e.g.*, *Greer v. Miller*, 483 U.S. 756 (1987); *Wainright v. Greenfield*, 474 U.S. 284 (1986).** *"Hale* and *Doyle* do not forbid all mention at trial of *Miranda* warnings and the defendant's response to them. They establish instead that silence following the receipt of *Miranda* warnings may not be used against a defendant." ***United States v. Higgins*, 75 F.3d 332, 333 (7th Cir. 1996).** Testimony that the defendant was advised of his rights and thereafter decided to remain silent does not ask the jury to infer guilt. ***Id.*** Use of an accused's silence against him is prohibited when his silence was induced by Miranda warnings because telling the accused he has a right to remain silent destroys the probative value of the accused's silence. ***Fletcher v. Weir*, 455 U.S. 603, 604-07 (1982).** There is no problem if a defendant speaks after receiving Miranda warnings, since such a defendant was not induced to remain silent. ***Splunge v. Parke*, 160 F.3d 368, 372-73 (7th Cir. 1998).**

The admission of the video tape did not ask the jury to make a forbidden inference from Morrison's silence, and therefore did not violate his due process rights. At the very least, most of the video tape was admissible. Morrison's arguments and this Court's review of the record did not reveal any suggestion by the prosecution that the jury should infer Morrison's guilt from his silence or make some other forbidden inference over which this Court

-10-

could grant relief. The closest the prosecution came to a violation was apparently during closing, when the prosecutor described the contents of the video tape. In summary, the prosecution described the tape as showing that Morrison lied about driving Colley's car, did not respond immediately to the officer's accusations, and then claimed he knew nothing about the shooting (Trial Tr. C544–45). The prosecution was not asking the jury to infer guilt from silence; it was asking the jury to infer guilt from Morrison's taped assertions that he was not driving the car he was arrested in, was not present at Colley's residence, and knew nothing about the shooting. It would not be unreasonable for the Illinois courts to determine that a prosecutor mentioning a period of silence between statements by a defendant while discussing the surrounding statements was not the sort of evidentiary use of silence forbidden by *Doyle* and its progeny.

Morrison also objects to Judge Proud's recommendations with respect to ineffective assistance of counsel. The first objection that the Court will examine is Judge Proud's supposed reliance on the facts of ***Allen v. Chandler*, 555 F.3d 596 (7th Cir. 2009)** (Pet'r's Objections ¶ 13). Morrison, again, misreads the Report and Recommendation. The facts of *Allen* were included only for the purpose of comparing that case to this one. Morrison misreads the Report and Recommendation as though it treated the facts of *Allen* as the facts of this case. Morrison also contends that *Allen* is not applicable to his case because the two are factually distinguishable (Pet'r's Objections ¶ 14), but does not explain why they are distinguishable. Cases are *always* factually distinguishable from one another in some way or another. Without some sort of explanation as to (1) which of the many ways in which they are distinguishable are important, and (2) how those differences change the outcome in this case, Morrison's objection is incomplete and meaningless.

Morrison's next objection is to "the R&R failing to consider trial counsel's failure

to object to the prosecutor's reference to the videotape in opening statement" (Pet'r's Objections 3), but petitioner stated in an earlier filing that "he has not assert[ed] any separate [i]neffective assistance of counsel claim[]s regarding the prosecution's opening statement[]s." (Pet'r's Reply 1.) Accordingly, Judge Proud did not address that ground. Morrison states on objection, though, that he was arguing in the response that separate claims for ineffective assistance of counsel for each error in his petition were unnecessary and that the Court was not barred in examining the opening statement on procedural default grounds. He claims he was not arguing that the failure to object during the opening statement was not part of his counsel's ineffective assistance. He argues that the Court should therefore consider the opening statement as part of its ineffective assistance evaluation. (Pet'r's Objections ¶¶ 9-12).

        The Court will assume that Morrison did not concede his argument with respect to opening statements, but that will not help him. As Morrison suggests, ineffective assistance of counsel is a single ground for relief no matter how many failings the lawyer may have displayed. ***Pole v. Randolph*, 570 F.3d 922, 934 (7th Cir. 2009) (citing *Peoples v. United States*, 403 F.3d 844, 848 (7th Cir. 2005)).** However, evidence and arguments supporting an ineffective assistance of counsel claim are procedurally defaulted if they are not presented to the state courts. ***See Bradshaw v. Richey*, 546 U.S. 74, 79 (2005) ("The Sixth Circuit also held that respondent was entitled to relief on the ground that the state courts' denial of his *Strickland* claim was unreasonable. . . . [T]he Sixth Circuit erred in relying on certain grounds that were apparent from the trial record but not raised on direct appeal.").**

        Morrison did not raise any issues regarding opening statements during state post-conviction proceedings or on direct appeal, so the opening statement argument is procedurally defaulted even if Judge Proud misinterpreted Morrison's concession. Although procedurally

defaulted claims can be revived if the petitioner shows prejudice from the alleged error and appropriate cause, *House v. Bell*, **547 U.S. 518, 536 (2004)**, and claim of ineffective assistance of counsel can provide appropriate cause to excuse a procedural default, *Franklin v. Gilmore*, **188 F.3d 877, 883 (7th Cir. 1999) (explaining that ineffective assistance of counsel excuses procedural default)**, Morrison also is not arguing that his post-conviction or his appeal counsel were ineffective, which if true would excuse this default.

Morrison next objects to the application of *Strickland v. Washington*, **446 U.S. 668 (1984)**, to his case and argues that it instead falls under *United States v. Cronic*, **466 U.S. 648 (1984).** (Pet'r's Objections ¶ 15). *Cronic* allows a sixth amendment claim to succeed without inquiring into counsel's actual performance or the actual effect on the trial in very limited circumstances. *Wright v. Van Patten*, **552 U.S. 120, 124 (2008).** *Chronic* applies when (1) the defendant is denied counsel at a critical stage; (2) counsel entirely fails to subject the prosecution's case to meaningful adversarial testing; or (3) counsel is called upon to represent a client in circumstances under which no lawyer could render effective assistance. *Miller v. Martin*, **481 F.3d 468, 472 (7th Cir. 2007).** Morrison does not allege he was denied counsel, nor does he allege a situation under which a competent lawyer would be unable to provide effective assistance. Morrison does not allege facts to support a claim that counsel entirely failed to subject the prosecution's case to meaningful adversarial testing, and this Court's review of the record shows significant adversarial testing. Defense counsel even objected to the admission of the video tape. *Strickland,* not *Cronic*, applies here.

The standard set by *Strickland* determines whether counsel was ineffective. Under *Strickland*, a petitioner must demonstrate that counsel's performance was deficient and that counsel's deficient performance prejudiced the defense. *Id.* **at 687.** In order to prove prejudice,

petitioner must show that but for counsel's unprofessional errors there is a reasonable probability that the result of the proceeding would have been different. *Id.* **at 694.** Demonstrating counsel's deficient performance requires a showing that counsel's performance was not reasonably effective. *Id.* **at 687–90.** A court need not examine both prejudice and the performance of counsel before rejecting a claim of ineffective assistance of counsel. *Id.* **at 697.**

   A constitutional error is harmless when it appears beyond a reasonable doubt that the error had no impact on the outcome of the trial. *Mitchell v. Esparza*, **540 U.S. 12, 17–18 (2003).** However, the Court does not undertake harmless review itself; instead, "habeas relief is appropriate only if the [state appellate court] applied harmless-error review in an 'objectively unreasonable' manner." *Id.* **at 18 (quoting** *Lockyer v. Andrade*, **538 U.S. 63, 75–77 (2003)).** The Fifth District's application was hardly unreasonable. Removing Morrison's silence from the video tape or using a transcript with the offending silences removed would not significantly change the impact of the tape. In the portion of the tape around the parts showing Morrison's silence, Morrison claimed he wasn't at Colley's home, did not know anything about a shooting, and was not driving Colley's car. Testimony of other witnesses showed he was at Colley's home and carried her body, and that he was arrested driving her car with her kids in the back seat. In other words, the prosecution used the tape to show Morrison lied during his interrogation. Considering its surroundings, Morrison's silence was unimportant filler. The Fifth District could reasonably conclude beyond a reasonable doubt that removing Morrison's silence from the tape would not have changed the outcome of his trial. Even if counsel should have objected, it was reasonable for the Fifth District to conclude that there was not a reasonable probability that the outcome of the trial would have been different.

3. <u>Morrison's Sixth Amendment Ground</u>

      Morrison argues his conviction violates the Confrontation Clause of the Sixth Amendment to the United States Constitution (Pet. 10). Glen and Douglas testified that shortly after the shooting one of Colley's sons, probably Alex, said that Jeff shot his mother. His statement was admitted to evidence under the spontaneous declaration hearsay exception (Resp., Ex. A 11–12). Morrison contends that the admission of the statement was improper because the boys did not witness the shooting and Colley's son was merely repeating what Glen told them.

      On April 16, 2002, the Fifth District decided Morrison's direct appeal (Resp., Ex. A). On October 2, 2002, the Illinois Supreme Court denied his petition for leave to appeal (Resp., Ex. G). At the time, the relevant Supreme Court precedents were *Idaho v. Wright*, **497 U.S. 805, 816 (1990),** and *Ohio v. Roberts*, **448 U.S. 56, 66 (1980)**. While the Supreme Court abrogated *Ohio v. Roberts* and its progeny in *Crawford v. Washington*, **541 U.S. 36 (2004),** *Crawford* does not apply retroactively, ***Whorton v. Bockting*, 549 U.S. 406, 416–21 (2007)**.

      The confrontation clause does not always prohibit the admission of hearsay statements against a criminal defendant, even though the admission of such statements may apparently violate the literal terms of the confrontation clause. ***Wright*, 497 U.S. at 813–14.** In *Roberts,* the Court set out a two step general approach for determining if a hearsay exception violates the confrontation clause. ***Id.* at 814–15.** First, the prosecution must either produce, or demonstrate the unavailability of the witness who made the out of court statement. After unavailability has been shown, the statement is admissible only if it bears adequate "indicia of reliability." ***Wright,* 497 U.S. at 815-16 (*citing Roberts*, 448 U.S. at 66).** "Reliability can be inferred without more in a case where the evidence falls within a firmly rooted hearsay exception. In other cases, the evidence must be excluded, at least absent a showing of

particularized guarantees of trustworthiness." *Id.* The Illinois spontaneous declaration exception is a firmly rooted hearsay exception, and satisfies the "indicia of reliability" requirement. ***Smith v. Fairman*, 862 F.2d 630, 636 (7th Cir. 1988).** The Fifth District determined that in order for a hearsay statement to be admissible under the spontaneous declaration exception, "(1) there must be an occurrence sufficiently startling to produce a spontaneous and unreflecting statement, (2) there must be an absence of time for the declarant to fabricate the statement, and (3) the statement must relate to the circumstances of the occurrence." (Resp., Ex. A 22) **(citing *Smith v. Williams*, 739 N.E.2d 455, 479-80 (2000)).**

The Fifth District examined the record and determined that the hearsay in question was properly admitted as a spontaneous declaration (Resp., Ex. A 12). Morrison objects to Judge Proud's finding that the hearsay statement was a spontaneous declaration and was properly admitted at trial (Pet'r's Objections ¶ 23). Morrison does not contest that a child witnessing the shooting of his mother is not sufficiently startling, or that the hearsay statement testified to by Glen and Douglas related to Colley's shooting. He does not suggest that the if the boys did see their mother shot then admitting the hearsay in question is proper. Morrison asserts that Colley's son did not see his mother shot, and that he heard that Morrison shot her from Glen rather than seeing it for himself.

The Court cannot provide relief from the Illinois appellate court's decision unless it was an unreasonable application of clearly established federal law as determined by the United States Supreme Court or an unreasonable determination of the facts based on the evidence before it. **28 U.S.C. § 2254(d).** Because the Illinois spontaneous declaration exception is firmly rooted, admission of hearsay under that exception is a reasonable application of *Roberts* and *Wright*, so Morrison's only remaining ground for objecting is that the Fifth District unreasonably

-16-

determined the circumstances surrounding the admission of the evidence. He does so, pointing to the affidavit of Shawn Hollowell that he included with his supplemental claim of actual innocence. Shawn Hollowell was incarcerated at Menard at the same time as Morrison and also, purportedly, shared a cell with Glen.

There is a significant difference between an unreasonable decision and an incorrect decision. Morrison must show that the state court not only committed an error, but that it committed an unreasonable error. ***Ward v. Sternes*, 334 F.3d 696, 703–04 (7th Cir. 2003).** Section 2254(e)(1) provides a mechanism for proving unreasonableness by allowing a petitioner to rebut the factual findings of a state court by clear and convincing evidence. ***Id.*** In evaluating the state court's performance, the prosecution's burden involved in the admission of evidence must be considered. There was no need for the Illinois court to find that Glen's testimony was true before admitting his testimony regarding the hearsay statement. The task of deciding if testimony is true, whether a witness is lying, and assigning weight to the evidence is the province of the jury. ***See, e.g., People v. Tenney*, 793 N.E.2d 571, 582 (Ill. 2002).**

The problem with this approach is that on the question of admissibility, the Illinois courts never determined that Colley's son saw the shooting beyond reasonable doubt. All it decided was that there was enough evidence in support of that proposition to support admitting the hearsay statement and letting the jury decide if it was true. This makes Morrison's burden on what he is attempting to disprove astronomical: proof by clear and convincing evidence that no reasonable fact-finder on admissibility (i.e. a judge) would find the evidence that the boys saw the shooting was so weak as to render the hearsay statement inadmissible. This is a heavier burden than proof by clear and convincing evidence that Glen's statement was untrue. Adding the statements of the Hollowell affidavit to the rest of the record, the evidence is far from clear

-17-

and convincing that Glen lied about where the boys were, and certainly not clear and convincing that Glen's testimony was so inaccurate to make the boys' statements inadmissible. As all we have is Glen's statement plus someone else seven years after the fact saying "he lied," the evidence barely, if at all, preponderates in Morrison's favor on this issue, let alone meets the higher standard of clear and convincing.

4. <u>Morrison's Actual Innocence</u>

Morrison raised a claim of actual innocence, centered on the affidavit of Shawn Hollowell. New evidence may excuse procedural default if in light of the new evidence "it is more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt." *House v. Bell*, 547 U.S. 518, 536–37 (2006) (citing *Schlup v. Delo*, 513 U.S. 298, 327 (1995)). This formulation ensures that a petitioner's case is "extraordinary." *Id.* at 537. The court may consider how the timing of the submission and the likely credibility of the affiant affects the reliability of new evidence. *Id.* An actual innocence claim does not evade the statutory timeliness rules. *Escamilla v. Jungwirth*, 426 F.3d 868, 871–72 (7th Cir. 2005).

As Judge Proud properly noted, whether Morrison's claim of actual innocence could excuse any procedural default by Morrison has no impact on this case as Morrison's petition contains no procedurally defaulted claims (Doc. 43 at 17). Nonetheless, Morrison objects to Judge Proud's finding and suggests that a hearing is necessary (Pet'r's Objections ¶ 25). This is a strange argument. Even if the Court were to hold an evidentiary hearing, it would not change the fact that of the three other grounds listed in the amended petition for habeas corpus (ineffective assistance, Sixth Amendment, and Illinois unconstitutionality), not one is procedurally defaulted. Actual innocence "is not itself a constitutional claim, but instead a gateway through which a habeas petitioner must pass in order to have his otherwise barred

-18-

constitutional claim considered on the merits." *Herrera v. Collins*, **506 U.S. 390, 404 (1993).**

Nevertheless, Morrison continues and tries to get time-barred claims in as the basis for raising his actual innocence claim. Judge Proud noted in a footnote that actual innocence is unrelated to statutory timeliness rules (Doc. 43 at 17 n.2). Morrison objects, arguing that Judge Proud misread *Escamilla v. Jungwirth*, **426 F.3d 868 (7th Cir. 2005)**, and suggests that the Court's decision denying his motion for leave to amend was in error (Pet'r's Objections ¶ 27). Judge Proud's reading of *Escamilla* was correct. Actual innocence does not excuse failure to raise a claim in a timely manner. *Id.* **at 871–72.** This objection is moot because Morrison's petition contains no time barred claims and this Court will not revisit the denial of Morrison's motion for leave to amend his petition to add time barred claims again. (*See* Docs. 41, 57.)

Morrison also objects to Judge Proud's finding that it is "doubtful" that Morrison's new evidence, the Hollowell affidavit, satisfied the standard set out in *Schlup v. Delo*, **513 U.S. 298 (1995)**. (Pet'r's Objections ¶ 24). The Hollowell affidavit is dated more than seven years after Morrison's conviction and is not notarized, though "submitted under penalty of purjury." (Hollowell Affid. 3.) Hollowell was apparently incarcerated with Morrison in the Menard Correctional Center. (Hollowell Affid. 1.) Hollowell has multiple felony convictions including convictions for forgery. (*See* Doc. 56 at 9; Doc. 50 at 6.) Hollowell's status as a felon, the timing of his affidavit, and his failure to come forward until after meeting Morrison in prison all impact Hollowell's credibility negatively. Hollowell's testimony would not be credible enough to prevent a reasonable juror from finding Morrison guilty beyond a reasonable doubt in light of the other evidence.

Finally, Morrison suggests that actual innocence is a free standing ground upon which a federal court may grant a writ of habeas corpus and objects that Judge Proud did not

consider it as such (Pet'r's Objections ¶ 26).[3] The Supreme Court has never held that a freestanding claim of actual innocence constitutes a ground for federal habeas relief. Only a decision "that was contrary to, or involved an unreasonable application of, clearly established Federal law" or "that was based on an unreasonable determination of the facts in light of the evidence *presented in the State court proceeding*" provide a basis for habeas relief from a state court judgment. **28 U.S.C. § 2254(d) (emphasis added).** While the issue has been raised before the Court several times, each time the Court declined to decide it. *See House*, **547 U.S. at 554–55.** Additionally, the Court noted that if it did eventually recognize a freestanding claim of actual innocence, the burden of proof required would almost certainly be higher than the burden established for excuse of procedural default in *Schlup.* ***House*, 547 U.S. at 554-55.** Since petitioner's present evidence does not satisfy the *Schlup* standard, it almost certainly cannot satisfy the requirements of a freestanding actual innocence claim that could, but does not at present, exist.

Even if actual innocence was allowed as a free-standing ground for relief in federal habeas, Morrison's claim must also fail as he as not exhausted his state remedies. **28 U.S.C. § 2254(b).** Illinois waives time limits for post-conviction petitions advancing claims of actual innocence in Illinois state courts and permits additional petitions for post-conviction relief in certain circumstances, which proof of actual innocence could satisfy. **725 Ill. Comp. Stat 5/122-1(c), (f) (2008).** Because Morrison could advance his actual innocence claim in Illinois

---

[3] An Illinois court's refusal to provide post-conviction relief in the face of compelling evidence of actual innocence violates the due process guarantee of the *Illinois* constitution. ***People v. Washington*, 665 N.E.2d 1330, 1336–37 (Ill. 1996).** While actual innocence is not a freestanding ground for post-conviction relief available to state prisoners in federal court, it is available to Illinois prisoners in Illinois courts.

court but has not done so, his state remedies are unexhausted. Even if relief under a freestanding claim of actual innocence were available under federal law, Morrison would have to present it to the Illinois courts first.

5. Remainder of Morrison's Objections

The remainder of Morrison's objections fault Judge Proud for not considering the following grounds for habeas relief. First, that the Illinois legislature violated the single subject requirement of the Illinois constitution when altering the penalties for aggravated kidnaping, and that this amounts to a violation of his federal due process rights. Secondly, with respect to his Sixth Amendment challenge, he objects to the lack of analysis of the unavailability prong of the analysis under *Ohio v. Roberts*, **448 U.S. 56 (1980)**, in the Report and Recommendation. (Pet'r's Objections ¶¶ 20–22.) Morrison contends that the boys were available since they appeared in court, so the hearsay statement should not have been admitted.

Judge Proud committed no error by not considering those grounds for relief. Morrison's petition for relief did not ask for habeas corpus on due process grounds. It asked for relief on Illinois law grounds, that the Illinois constitution was violated (Pet. 10), but Judge Proud correctly noted that federal courts "may not review state-court interpretations of state law." *Curtis v. Montgomery*, **552 F.3d 578, 582 (7th Cir. 2009).** Morrison never raised the Due Process challenge until after Judge Proud's report. Similarly, although Morrison raised the Sixth Amendment challenge, he did not complain about the actual availability of the boys but instead, as noted above, complained that "it was unclear that the child actually saw his mother shot, as opposed to merely repeating what another suspect in the murder had told him." (Pet. 10.) The complaint about availability, again, surfaces after the report issued.

Morrison included none of these grounds in any way, shape or form, in original or amended petitions, so Judge Proud had no opportunity to consider them. Because Judge Proud could not have considered those grounds, the Court cannot either. The Court cannot make a de novo determination of matters not properly presented to the magistrate judge. These objections, accordingly, are not before the Court.

6. Gaetz's Objection

Gaetz, the warden/respondent in this case, objects to Magistrate Judge Proud's finding that Morrison did not procedurally default his Sixth Amendment challenge to the admission of Colley's four-year-old son's out of court statement as a spontaneous declaration. At this point, though, Gatez's objection is academic. Judge Proud denied the Sixth Amendment challenge to Morrison's conviction, and the Court agrees. If Gaetz's objection were upheld, it would result in the exact same conclusion: Morrison's Sixth Amendment challenge fails. There is no need for the Court to consider it.

D.      Conclusion

Morrison's objections are without merit, and Gaetz's objection is moot. The Court accordingly **OVERRULES** both Gaetz's objections and Morrison's objections (Docs. 44, 47, 54) and **ADOPTS** Judge Clifford J. Proud's Report and Recommendation (Doc. 43). Accordingly, Morrison's Petition for Writ of Habeas Corpus, as amended, is **DENIED**. The

Court **DIRECTS** the Clerk of Court to enter judgment denying Morrison's petition and to close the case.

**IT IS SO ORDERED.**

**Dated January 28, 2010.**

**s/ Michael J. Reagan**
**MICHAEL J. REAGAN**
**United States District Judge**